# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

BETH A. STADTFELD,            )
                              )
        Plaintiff,         )    2:08-cv-675
                              )
v.                            )
                              )
COMMISSIONER OF SOCIAL SECURITY, )
                              )
        Defendant.         )
                              )

## MEMORANDUM OPINION AND ORDER OF COURT

**I.    Introduction**

Pending before the court are cross-motions for summary judgment based on the administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No. 14) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 11). The motions have been fully briefed and are ripe for resolution.

Plaintiff, Beth A. Stadtfeld, brought this action pursuant to 42 U.S.C. § 405(g) and §1383(c)(3) for judicial review of the final determination of the Commissioner of Social Security ("Commissioner") which denied her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-403; 1381-1383f.

**II.    Background**

    **A.    Facts**

Plaintiff was born on September 2, 1965, and was 41 years old at the time of the hearing, and therefore was defined as a "younger individual," age 18-44, pursuant to 20 C.F.R.

§ 404.1563 and §416.963. R. 23. Plaintiff has at least a high school education and is able to communicate in English. R. 23. Plaintiff's relevant work history was as a lottery ticket cashier and as a healthcare aide. R. 478, 482. She was working as a hostess three or four days a week at the time of the hearing. R. 460. Her earnings record reveals that she has acquired sufficient coverage to remain insured through September 30, 2009. R. 17.

Plaintiff alleges disability since August 26, 2004 due to diabetes, high blood pressure, tachycardia, and emotional problems. R. 44-47, 68, 71, 421-22. Plaintiff was diagnosed with diabetes and hypertension in January 2000. R. 166. On January 7, 2001, Plaintiff was hospitalized for three days due to elevated blood sugars. R. 197-200. Plaintiff was provided with insulin and given Buspar for reported anxiety and depression problems. R. 197-200. In September 2003, Plaintiff hurt her shoulder and neck lifting a patient at her home health aide job. R. 269. X-rays of the shoulder showed no gross osseous abnormalities and x-rays of the cervical spine showed a loss of cervical lordosis. R. 271. Plaintiff attended physical therapy sessions from September 2003 through December 2003 for left shoulder rotator cuff tendonitis. R. 238-253.

On May 12, 2004, Plaintiff was admitted to the hospital and upon arrival was anxious, confused, agitated, and screaming. R. 356. Plaintiff reported that she was short of breath, that her heart was racing, and that she felt like she was in a dream. R. 362. She further reported that she felt like she was leaving her body and also that she was dying. R. 377. Plaintiff told doctors that she was working a lot of hours at her job, which was producing anxiety. R. 362, 377, 382. Plaintiff reported that she was working two jobs trying to support her child and the child's father. R. 362, 377, 382. Plaintiff reportedly stopped taking her blood pressure

medications prior to her hospitalization because she could not afford them. R. 362. Plaintiff's spouse was disabled. R. 377. Plaintiff denied a history of sexual, verbal, or physical abuse. R. 385.

Dr. Steven Riggall diagnosed Plaintiff with generalized anxiety disorder while she was hospitalized. R. 363. Plaintiff had a global assessment of functioning (GAF) score of 21.[1] R. 363. During Plaintiff's mental status examination, Dr. Riggall reported that Plaintiff had fair concentration, good memory, did not report irritability, reported that she was always tired, and denied hopelessness. R. 362. Riggall further reported that Plaintiff was alert and oriented times three, her speech was normal with regard to rate and flow, her eye contact was fair, she denied homicidal or suicidal ideation, she denied hallucinations or delusions, she was positive for flight of ideas, had good hygiene, and was dressed appropriately. R. 362. On May 14, 2003, Plaintiff reported feeling much better since restarting her blood pressure medications and reported that she would decrease her workload to reduce her stress, and would spend more quality time with her daughter. R. 369, 399.

On August 31, 2004, Plaintiff was seen by her cardiologist, Dr. Ronnie Mignella, M.D., for a follow-up appointment. R. 254-55. Dr. Mignella reported a history of sinus tachycardia, valvular heart disease, mild hypertension, and morbid obesity. R. 254. Plaintiff reported palpitations which Mignella felt were the result of anxiety from emotional stress. R. 254. He noted that she had been monitored at the emergency room and found to have a normal rhythm. R. 254. He further noted that Plaintiff's hypertension was well controlled and that the

---

[1] A GAF in the 21 to 30 range indicates "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communications or judgment OR inability to function in all areas." DSM-IV-TR, p. 34.

remainder of the examination was unremarkable. R. 254-55. He reported that the patient was doing "quite well." R. 254.

On September 3, 2004, Plaintiff was evaluated by Dr. Mark Stabile, D.O., at Parkside Orthopedic Associates following the re-injury of shoulder and her neck at work on August 26, 2004. R. 269-71. Plaintiff had x-rays which revealed no gross osseous abnormalities in the left shoulder, but also revealed a loss of the cervical lordosis. R. 271. An MRI indicated mild broad-based disc bulging "of the disc indenting the anterior thecal sac, but not causing any significant impression on the foramina or exiting nerve roots." R. 272. Dr. Stabile prescribed Naprosyn and physical therapy, which Plaintiff attended from September 2004-November 2004. R. 265, 273-85. At her first physical therapy appointment, the therapist noted that "this lady with significant limitations in cervical spine causing local reproduction of her symptoms. I am unable to reproduce her left shoulder pain with cervical spine exam." R. 277. On October 18, 2004, Plaintiff returned to Dr. Stabile who indicated that Plaintiff's neck was fine, but that Plaintiff was still experiencing pain in her left shoulder. R. 259. However, she also reported that the physical therapy was providing relief. R. 259. Upon discharge from physical therapy, the therapist reported that Plaintiff had mild discomfort in her left shoulder and could lift and carry thirty pounds. R. 273.

On September 9, 2005, Dr. Roy Sartori, D.O., performed a consultative exam at the state agency's request. Examination of Plaintiff's heart indicated no murmurs, gallops, rubs, or honks and no arrhythmia. R. 289. She further had normal grip strength in her right hand, but a 25% reduction in her left hand. She was able to bend and crouch normally and get on and off the examination table normally. R. 289. Dr. Sartori further indicated that there were no

4

problems with lifting and grasping. R. 289. Dr. Sartori's impressions included that Plaintiff suffered from palpitations secondary to anxiety, morbid obesity, cervical radiculitis with chronic cervical strain and sprain, degenerative disc disease of the cervical spine, anxiety disorder, type II diabetes mellitus, and hypertension well controlled. R. 289. Dr. Sartori opined that Plaintiff could lift 25 pounds frequently and carry 10 pounds frequently. R. 291. He further opined that Plaintiff could stand for 1 to 2 hours; could sit for less than 6 hours; had no limitations on pushing or pulling; could frequently bend, kneel, stoop, crouch, balance, and climb; and that she had restriction in reaching with her left arm but not her right. R. 291.

On September 14, 2005, Dr. Joseph Kalik, plaintiff's family practitioner, filled out a form regarding Plaintiff's diagnoses. R. 298-99. Dr. Kalik indicated that Plaintiff suffered from anxiety with occasional panic attacks, but that Plaintiff was having a good response to Lorazepam. R. 298. Dr. Kalik further indicated that Plaintiff kept her scheduled appointments, interacted appropriately with office staff, and dressed appropriately. R. 298. Finally, he noted no difficulties with Plaintiff's activities of daily living, ability to function socially, and maintain concentration, persistence, and pace. R. 298-99. In a treatment note dated September 9, 2005, Dr. Kalik indicated that Plaintiff could walk steady and fast, bend and crouch, and get on an off the examination table easily. R. 300. On January 24, 2006, Plaintiff was seen by Dr. Iftikhar Chatha, M.D. and reported no new complaints. R. 344-45. Her physical examination was completely normal. R. 344-45. No changes were reported at two follow-up appointments in April and August of 2006. R. 334-35, 337-38.

On September 19, 2006, Jule Uran, Ph.D. and Martin Meyer, Ph.D., prepared a psychological report for the Office of Vocational Rehabilitation. (OVR). R. 347-81. Plaintiff

was given cognitive testing and was found to have borderline cognitive ability. R. 350. Plaintiff reported that she had been mentally, sexually, and physically abused by her daughter's father who was currently living in her home. R. 348. Based on their assessment, Uran and Meyer diagnosed Plaintiff with major depressive disorder, recurrent (without psychotic features); panic disorder with agoraphobia; and post-traumatic stress disorder. R. 351. They also assessed her with a GAF of 50.[2] R. 351.

Plaintiff began counseling at the Primary Health Network on September 28, 2006. R. 400-02. Plaintiff was oriented times three; had fair concentration, insight, and judgment; and good motivation. R. 402. Plaintiff was assessed with a GAF of 55[3] with her highest in the past year being 65[4] and her lowest 55. R. 402. Two months after the administrative hearing, Plaintiff went for a counseling intake assessment at Paoletta Psychological Services. R. 403-14. Plaintiff reported that she was currently employed part-time at Eat 'N Park. R. 405, 408. Plaintiff was dressed appropriately, casually, and cleanly; was cooperative; and was moderately depressed. R. 412. The intake coordinator also indicated that Plaintiff had average intelligence; logical, organized, and coherent thought; and adequate insight. R. 412. The therapist diagnosed PTSD, a panic disorder, rule out major depressive disorder, and assessed a GAF score of 55. R. 414.

---

[2] A GAF in the 41 to 50 range indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupation, or school functioning (e.g. no friends, unable to keep job)." DSM-IV-TR, p. 34.

[3] A GAF in the 51 to 60 range indicates "Moderate symptoms OR any moderate difficulty in social occupational or school functioning." DSM-IV-TR, p. 34.

[4] A GAF in the 61 to 70 range indicates "Some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR, p. 34.

On June 19, 2007, Plaintiff's attorney referred her back to Dr. Uran for a second psychological evaluation. R. 415. After talking with Plaintiff, Dr. Uran indicated that the prognosis was "poor in terms of higher level functioning. She appears to be decompensating in all domains. Learning problems will continue." R. 419. Dr. Uran noted that Plaintiff would have difficulty in a vocational environment with perseverance, pace, and sustained concentration; complex directions; and consistent job attendance. R. 419. Dr. Uran's diagnoses remained unchanged, but she indicated that Plaintiff now had a GAF of 45. R. 419.

**B.    Procedural History**

Plaintiff protectively filed applications for DIB and SSI on June 29, 2005, alleging disability since August 26, 2004 due to diabetes, high blood pressure, tachycardia, and emotional problems. R. 44-47, 68, 71, 421-22. The claim was denied. R. 31-32, 423. The case was then randomly selected to test modifications to the disability determination process, and the reconsideration step of the administrative review process and escalated to the hearing level. R. 35, 426. An administrative hearing was held on April 3, 2007 before Administrative Law Judge Timothy C. Pace ("ALJ"). R. 459-499. Plaintiff was represented by counsel and testified at the hearing. R. 460-83, 494-96. Plaintiff's father and Fred Monaco, a vocational expert, also testified at the hearing. R. 484-88, 491-94, 496.

On August 11, 2007, the ALJ rendered a decision which was unfavorable to Plaintiff under the five-step sequential analysis used to determine disability. R. 15-25. The ALJ determined at step one that Plaintiff was not engaging in substantial gainful activity. R. 17. At step two, the ALJ found that she has the following severe impairments: "anxiety; post traumatic stress disorder; diabetes mellitus; major depressive disorder; obesity; hypertension; valvular

7

heart disease; cervical degenerative disc disease; and left shoulder tendonitis." R. 17. At step three, the ALJ concluded that Plaintiff's impairments did not meet or equal one of the listed impairments set forth in 20 C.F.R. 404 Subpart P, App. 1. R. 19. At step four, the ALJ determined that Plaintiff was unable to return to her past relevant work. R. 23. At step five, the ALJ concluded that the government had met its burden to show that Plaintiff had the residual functional capacity to perform sedentary work that exists in the national economy, but that she was limited to unskilled work with minimal interaction with others. R. 21-23. The ALJ's decision became the final decision of the Commissioner on March 17, 2008, when the Appeals Council denied Plaintiff's request to review the decision of the ALJ. R. at 6-10. This litigation followed.

**III.    Legal Analysis**

    A.    <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'n of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Secretary of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1) (1982). This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,
>
> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to

the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

    **B.**    **Discussion**

Plaintiff makes two specific arguments in her motion for summary judgment. She claims that the ALJ failed to analyze all of the evidence of record and/or provide an adequate explanation for disregarding that evidence and that the ALJ did not treat her treating physicians' opinions with the appropriate weight. Plaintiff merged both arguments in her brief. Plaintiff claims that the opinions of Dr. Kalik, Primary Health, Dr. Meyer, Dr. Uran, Dr. Lockward, and Paoletta Psychological services were not treated with the appropriate weight. Plaintiff takes further issue with the finding of the ALJ that Drs. Uran and Meyer were not treating physicians and that rejection of this evidence was not sufficiently explained. Defendant argues that the whole of the ALJ's determination is supported by substantial evidence. The Court agrees with Defendant.

*Dr. Lockward and Sharon Regional Health Records*

In her argument, Plaintiff relies on the interrogatories and single medical record of Dr. Maximo Lockward, M.D. from October 29, 2007 and from Sharon Regional Health for a psychiatric hospitalization on November 29, 2007. Both sets of these records were filed with the Commissioner when the case reached the Appeals Council and were from a period outside the scope of the ALJ's decision. In their opinion, the Appeals Council stated: "the evidence that was before the administrative law judge did not show that you were experiencing mental

limitations to the extent that they were observed by the state agency in the subsequent application. Therefore, the Council concludes that there was a worsening of your mental impairments after the date of the Administrative Law Judge's decision and that there is no reason to disturb the findings contained in that decision." R. 7.

While the Plaintiff does not directly challenge the decision of the Appeals Council not to consider this additional information, Plaintiff's reliance on these records requires that this issue be addressed. For the submission of Dr. Lockward's interrogatories and Sharon Regional's records to be considered after the rendering of the ALJ's opinion, it would be necessary for the information submitted to meet three criteria: it must be new, material, and the failure to submit the documentation during the administrative proceeding must be for "good cause". *Shuter v. Astrue*, 537 F.Supp.2d 752, 756-57 (E.D.Pa., 2008).

Dr. Lockward did not treat Plaintiff until two and half months after a decision was rendered by the ALJ in this case and Plaintiff was not hospitalized until three and a half months after a decision was rendered in this case. Plaintiff filed a second social security case for the time period in which she visited Dr. Lockward and was admitted to Sharon Regional Health. Importantly, for newly provided evidence to be material, it must "relate to the time period for which benefits were denied and must not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Shuter,* 537 F.Supp.2d at 757.  In *Shuter v. Astrue*, the court determined that records pertaining to events occurring after the date of the ALJ decision should be excluded from review. *Id*. at 757, n. 4. Therefore, the records of Plaintiff's psychiatric hospitalization on November 29, 2007, being an event occurring after the date of the decision, are not appropriate for review before this Court.

A similar issue is raised with regard to Dr. Lockward's records because he did not evaluate Plaintiff until October 29, 2007. Dr. Lockward commented that Plaintiff's GAF was "currently" 45, but did comment on her GAF for the time period pertaining to the ALJ's decision. R. 440. Additionally, Lockward noted that her anxiety and depression would "directly impair her ability to function in a work environment at this point," but did not comment on the period relating to the ALJ decision. R. 432. Finally, the Third Circuit has held that evidence is new only if it is not merely cumulative of what is already in the record. *Szubak v. Secretary of Health and Human Services*, 745 F.2d 831, 833 (3d Cir. 1984). Plaintiff proposes in her argument that Dr. Lockward's opinion was consistent with that of her other treating physicians. In fact, his diagnoses is the same as was stated in her medical records pertaining to the period of the ALJ opinion. R. 440. Therefore, Dr. Lockward's records relates both to a different time period and is cumulative of information already in Plaintiff's record. As such neither Dr. Lockward nor the Sharon Regional Health records from the November 29, 2007 hospitalization will be reviewed by this Court.

*Medical Evidence*

Plaintiff further takes issue with the ALJ's treatment of the medical opinions and evaluations that were considered in the opinion. When considering medical evidence, an ALJ must consider "*all medical evidence in the record* and provide *adequate explanations* for disregarding or rejecting evidence..." *Akers v. Callahan*, 997 F. Supp. 648, 661 (W.D. Pa. 1998). Therefore, an ALJ may not reject a physician's findings before explaining why certain evidence has been rejected and other evidence accepted. *Terwilliger v. Chater*, 945 F. Supp. 836, 843 (E.D. Pa. 1996). In the case of a treating physician, those findings must be given

greater weight than those of a physician who has examined the claimant once or not at all. *Terwilliger*, 954 F. Supp. 836 at 843. The opinions of a treating physician may only be rejected on the basis of contradictory medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d. Cir. 1988). The ALJ may also assign weight based upon the extent to which records or reports contain supporting explanations. *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

Plaintiff contends that the opinions of Dr. Kalik, Primary Health, and Paoletta Psychological services were not given the appropriate weight. Plaintiff argues that the diagnoses of these treating physicians, psychologists, and therapists indicate that Plaintiff had panic attacks and anxiety disorder and support the opinions of Drs. Meyer and Uran.[5] The ALJ assessed Dr. Meyer and Dr. Uran's opinions as follows:

> The undersigned assigns very little weight to the opinions of Dr. Meyer and Dr. Uran in Exhibit 15F, or the opinions of Dr. Uran in Exhibit 20F. These reports were prepared at the request of the claimant's attorney and these psychologists do not have a treating relationship with the claimant. These reports are inconsistent with the medical record, and the claimant's testimony. These reports indicated that the claimant had a GAF scale as low as 45 contrary to reports by treating physicians who determined that she had a GAF scale of 55 reflective of moderate symptoms and limitations in September 2006 and June 2007. (Exhibits 18F and 19F). Dr. Uran concluded that the claimant was unable to work,

---

[5] Plaintiff refers to Drs. Meyer and Uran as treating physicians. However, there is no evidence that Plaintiff ever saw Dr. Meyer or Dr. Uran for treatment. Instead, she was referred there for evaluation on two occasions, once by OVR and once by her attorney. 20 C.F.R. § 416.902 defining treating source states, "Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s)....We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source." Since, Plaintiff was only referred for evaluation and did not seek treatment from Dr. Meyer or Uran and only saw them on two occasions, it would not be appropriate to treat either as a treating source. This is especially true for the second report as the referral was made by Plaintiff's attorney for the purposes of obtaining a report.

>but the claimant testified that she was working 3 to 4 days a
>week.

R. 23. At the first evaluation, Uran and Meyer diagnosed Plaintiff with major depressive disorder, recurrent (without psychotic features); panic disorder with agoraphobia; and post-traumatic stress disorder. R. 351. They also assessed her with a GAF of 50. R. 351. At the second evaluation, Dr. Uran indicated that the prognosis for Plaintiff was "poor in terms of higher level functioning. She appears to be decompensating in all domains. Learning problems will continue." R. 419. Dr. Uran also noted that Plaintiff would have difficulty in a vocational environment with perseverance, pace, and sustained concentration; complex directions; and consistent job attendance. R. 419. Dr. Uran's diagnoses from the first evaluation remained unchanged, but she indicated that Plaintiff now had a GAF of 45. R. 419.

Plaintiff argues that her treating source records and opinions support the findings of Dr. Uran and Meyer, and therefore, the written evaluations should have been given further consideration. In May 2004, Plaintiff was assessed with a GAF of 21 while in the psychiatric unit at Sharon Regional Health and also diagnosed with panic attacks and anxiety. R. 363. However, Plaintiff claimed a disability onset date of August 26, 2004, and later medical evidence suggests that she was doing significantly better since her hospitalization. Upon discharge from the hospital, Plaintiff reported that she was doing much better and it was indicated that she was stable on medication. R. 369, 391, 399. On September 14, 2005, Dr. Joseph Kalik indicated that Plaintiff was suffering from anxiety with occasional panic attacks, but was having a good response to Lorazepam. R. 298. He noted that Plaintiff was appropriate at appointments and would not have difficulties with the activities of daily living, ability to function socially, or maintain concentration, persistence, and pace. R. 298-99. A year later in

September 2006, Plaintiff was receiving counseling at the Primary Health Network and it was reported that she was oriented times three; had fair concentration, insight, and judgment; and good motivation. R. 402. They assessed Plaintiff as having a GAF of 55, five points higher than that assessed by Drs. Uran and Meyer just nine days before. R. 402. Finally, Plaintiff presented for a counseling intake assessment at Paoletta Psychological Services in June of 2007. Plaintiff reported that she was working part-time at Eat 'N Park. The intake coordinator indicated that Plaintiff was moderately depressed and the therapist assessed a GAF of 55, which was ten points higher than that assessed by Dr. Uran on June 19, 2007.

Plaintiff additionally argues that the ALJ did not appropriately consider the interaction between Plaintiff's mental and physical impairments. However, the ALJ thoroughly addressed all of Plaintiff's ailments, both physical and mental. On August 31, 2004, Plaintiff was seen by her cardiologist who reported that her hypertension was well controlled and that she was doing "quite well." R. 254-55. Additionally, x-rays ordered by Dr. Mark Stabile indicated no gross osseous abnormalities in Plaintiff's left shoulder and a physical therapist later noted that he was unable to reproduce Plaintiff's left shoulder pain. R. 271, 277. Plaintiff was also diagnosed with mild broad-based disc bulging after an MRI, but Dr. Stabile later indicated that physical therapy was providing relief and a therapist determined that Plaintiff could lift and carry 30 pounds. R. 272, 259, 273.

Dr. Sartori, a consulting physician, indicated that Plaintiff could bend and crouch normally; get on and off the examination table normally; had no problems with lifting or grasping; could lift 25 pounds frequently and carry 10 pounds frequently; had no limitations in pushing or pulling; could frequently bend, kneel, stoop, crouch, balance, and climb; and had

15

restriction in reaching with her left arm but not her right. R. 289-91. Additionally, Dr. Kalik indicated that Plaintiff could walk steady and fast, bend and crouch, and get on and off the examination table easily. Dr. Chatha indicated a completely normal examination with no changes in two follow up appointments. Finally, after an initial hospitalization in January 2001 for elevated blood sugars, Plaintiff was put on insulin and no further issues with her diabetes were noted in the record. R. 197-200.

Since the majority of the medical evidence does not support the opinions of Drs. Meyer and Uran that Plaintiff would have difficulty working and was suffering from serious psychological symptoms prior to the time of the ALJ opinion, the ALJ appropriately rejected their findings since they were not treating sources. Additionally, the ALJ appropriately explained why he rejected findings of Dr. Meyer and Uran by citing to the conflicting medical evidence. Finally, Plaintiff has not indicated how interactions between her physical and mental symptoms would lead to a different finding from that of the ALJ as by all indications her physical problems were controlled.

## IV.     Conclusion

Under the Social Security regulations, a federal district court reviewing the decision of the Commissioner denying benefits has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration. 42 U.S.C. § 405(g) (sentence four). In light of an objective review of all evidence contained in the record, the Court finds that the ALJ's properly addressed the evidence presented in this case. Therefore, the ALJ's decision was supported by substantial

evidence. Defendant's motion for summary judgment is therefore granted, and Plaintiff's motion for summary judgment is denied.

An appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETH A. STADTFELD, | ) | |
| | ) | |
| Plaintiff, | ) | 2:08-cv-675 |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**ORDER OF COURT**

**AND NOW**, this 16th day of April, 2009, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED**, **ADJUDGED, AND DECREED** that:

1. Defendant's Motion for Summary Judgment (Document No. 14) is **Granted.**

2. Plaintiff's Motion for Summary Judgment (Document No. 11) is **Denied.**

3. The Clerk will docket this case as closed.

BY THE COURT:

s/Terrence F. McVerry
United States District Court Judge

cc: Thomas A. Dill, Esquire
Email:tad@fdgs-law.com

Paul Kovac, Esquire
Email: paul.kovac@usdoj.gov